Dennis Lee BLACK, Guardian Ad Litem of his minor child, Daniel Black, Petitioner,

v.

SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 90–3195V.

United States Court of Federal Claims.

May 30, 1995.

Jeffrey L. Viken, Rapid City, SD, atty. of record, for petitioner.

Michael P. Milmoe, Washington, DC, with whom was Asst. Atty. Gen. Frank W. Hunger, for respondent.

## OPINION

YOCK, Judge.

This case comes before the Court on the petitioner's Motion for Review of Special Master Richard B. Abell's Dismissal Order, *Black v. Secretary of Dep't of Health & Human Servs.*, No. 90-3195V, 1995 WL 39354 (Fed.Cl.Spec.Mstr. Jan. 20, 1995) (hereinafter Dismissal Order), dismissing petitioner's claim for compensation under the National Vaccine Injury Compensation Program ("the Vaccine Act" or "the Program").[1] The special master held that the petition failed to provide sufficient supporting documentation demonstrating that the petitioner had incurred in excess of $1000 in unreimbursable expenses due in whole or in part to the vaccine-related injury as mandated in section 11(c)(1)(D)(i) of the Vaccine Act. Finding that such a showing is a jurisdictional prerequisite for entry into the Vaccine Program, the special master dismissed the petitioner's claim due to lack of jurisdiction.

The Petitioner timely moved for review by the United States Court of Federal Claims, and raised three bases for objecting to the special master's Dismissal Order: (1) that the special master erred by equating "incurred unreimbursable expenses" with unreimbursable expenses actually paid prior to petitioner's filing of his petition; (2) that the special master's interpretation of subsection 11(c)(1)(D)(i) is unreasonable and leads to an absurd result; and (3) that the special master's interpretation of subsection 11(c)(1)(D)(i) denies the petitioner fundamental fairness, due process, and equal protection under the law.

This Court is unpersuaded by the petitioner's arguments and affirms the special master's Dismissal Order.

### Factual Background

Daniel Black was born on July 10, 1984. On December 14, 1984, Daniel received the second of two diphtheria-pertussis-tetanus (DPT) vaccinations at the Sioux San Indian Health Service Hospital in Rapid City, South Dakota. Within hours of the injection, Daniel suffered, for the first time in his previously healthy life, manifestations of vaccine-related injuries, *i.e.*, encephalopathy and residual seizure disorder. The seizures continued in a severe fashion with many episodes during the next year and a half, and, despite aggressive medication therapy with various antiepileptic drugs, Daniel still suffers from a seizure disorder. Additional residual effects exist as complications of the vaccination, such as gross and fine motor skill impairment.

On October 1, 1990, Dennis Lee Black, Daniel's father, filed a petition and three volumes of medical records on Daniel's behalf under the provisions of the Vaccine Act claiming that, as the direct result of the administration of a DPT vaccination on December 14, 1984, Daniel suffered a residual seizure disorder and an encephalopathy. The Vaccine Act awards compensation to individuals who have suffered vaccine-related injuries after an inoculation. In general, to obtain an award, a petitioner must make several factual demonstrations, including showings that the petitioner received a vaccination covered by the statute; received it in the United States; suffered an injury caused by the vaccination, or in many cases presumed to be caused by the vaccination; suffered residual effects lasting at least six months from the injury; incurred at least $1000 in unreimbursable expenses as a result of the injury; and has received no previous award or settlement on account of the injury. Subsection 11(c).

On December 14, 1990, the Chief Special Master requested additional medical records and financial information from the petitioner. On February 11, 1991, the petitioner submitted more medical records and the opinions of several medical experts. On November 3, 1993, the Chief Special Master ordered the Government to file its Preliminary Review, which the respondent did on February 22, 1994. In its Preliminary Review, the respondent voiced her concern that the petitioner had not provided documentation to meet the

---

1. The applicable statutory provisions governing the Vaccine Program are found at 42 U.S.C. §§ 300aa-10 *et seq.* (1988 & Supp. V 1993).

Hereinafter, for ease of citation, all references will refer to the relevant subsection of the current amended version of 42 U.S.C. § 300aa.

requirements of section 11(c)(1)(D)(i) of the Vaccine Act, which states:

(c) Petition content

A petition for compensation under the Program for a vaccine-related injury or death shall contain—

(1) * * * an affidavit, and supporting documentation, demonstrating that the person who suffered such injury or who died—

\* \* \* \* \* \*

(D)(i) * * * incurred unreimbursable expenses due in whole or in part to such illness, disability, injury, or condition in an amount greater than $1,000 * * *.

\* \* \* \* \* \*

The petitioner, on April 21, 1994, filed supplemental affidavits in support of his claim (including attached invoices and receipts) stating that Dennis Black, the petitioner's father, purchased a computer system for $814.15 on September 22, 1990, designed to improve Daniel's fine motor skills, eye-hand coordination, cognitive skills and to reinforce the specialized educational therapy which Daniel began receiving. The supplemental affidavit of Dennis Black further stated that thereafter, from February 4, 1992, to April 6, 1994, he spent an additional $3,719.75 on computer equipment and software, due at least in part to Daniel's continuing computer-assisted specialized educational and therapy program.

On May 17, 1994, the Secretary of the United States Department of Health and Human Services (the respondent) submitted her own supplemental filing, asserting that the petitioner still had not met the requirements of section 11(c)(1)(D)(i) because the expenses were not medical in nature and because all of the expenses, with the exception of $814.15, were not actually paid by the petitioner until after the filing of his petition on October 1, 1990. Accordingly, the respondent moved for the dismissal of the petition for lack of jurisdiction.

The petitioner responded once more on July 26, 1994, by filing an affidavit from Mr. James Conoyer, the Service Unit Director for Sioux San Indian Health Service Hospital in Rapid City, South Dakota. Mr. Conoyer attested that the petitioner had incurred medical expenses totalling $17,427.10, although these expenses were paid for by the Indian Health Service.

Finally, on January 20, 1995, Special Master Abell filed his Dismissal Order dismissing Daniel Black's petition "because petitioner has failed to substantiate his claim that he has incurred in excess of $1,000 in unreimbursable expenses as required by § 11(c)(1)(D)(i)." Dismissal Order at 5. The special master found that prior to the filing of Daniel Black's petition on October 1, 1990, the only unreimbursable expenses that he incurred amounted to $814.15, or $185.85 less than the $1,000 statutory threshold.

## Discussion

### 1. Standard of Review

On review to the United States Court of Federal Claims, the applicable standard is clear: a special master's decision may not be disturbed unless it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Subsection 12(e)(2)(B); *Munn v. Secretary of Dep't of Health & Human Servs.*, 970 F.2d 863, 869 (Fed.Cir.1992). Errors of law are reviewed under the "not in accordance with law" standard. *Munn*, 970 F.2d at 870; *Hossack v. Secretary of Dep't of Health & Human Servs.*, 32 Fed.Cl. 769 (1995). The Court of Federal Claims reviews such questions of statutory interpretation *de novo*. *Neher v. Secretary of Dep't of Health & Human Servs.*, 984 F.2d 1195, 1198 (1993); *Hossack*, 32 Fed.Cl. at 773; *Staples v. Secretary of Dep't of Health & Human Servs.*, 30 Fed.Cl. 348, 353–54 (1994); *Allison v. Secretary of Dep't of Health & Human Servs.*, 23 Cl.Ct. 551, 554 (1991); *Hale v. Secretary of Dep't of Health & Human Servs.*, 22 Cl.Ct. 403, 406 (1991). Because the objections to the Dismissal Order raised by the petitioner allege errors of law and statutory interpretation, this Court will review the questions *de novo*.

### 2. The Petitioner's Three Objections

The petitioner contends that the special master erred by interpreting subsection 11(c)(1)(D)(i) of the Vaccine Act as requiring,

as a matter of jurisdiction, that a petitioner demonstrate that he or she has actually paid out of pocket at least $1000 in unreimbursable expenses due to the vaccine-related injury prior to filing.

█ The petitioner refers to *Olascoaga v. Secretary of Dep't of Health & Human Servs.*, No. 93–0616V, 1994 WL 100687 (Fed. Cl.Spec.Mstr. March 19, 1994), which ruled that "[t]he petition content requirements of § 11(c) are merely elements which must be proven to establish a prima facie case of entitlement. The elements are not jurisdictional." *Id. Accord Smith v. Secretary of Dep't of Health & Human Servs.*, No. 91–0057V, 1992 WL 210999 (Fed.Cl.Spec.Mstr. Aug. 13, 1992).

█ This Court disagrees, however, with the special master's holding in *Olascoaga.* Instead, this Court holds that the requirements of subsection 11(c) are indeed jurisdictional and that a potential petitioner must do something more than merely submit a petition and an affidavit parroting the words of the statute. *Hammond v. Secretary of Dep't of Health & Human Servs.*, No. 91–1238V, 1994 WL 59444 (Fed.Cl.Spec.Mstr. Feb. 15, 1994), *aff'd,* (Fed.Cl. July 12, 1994). He or she must submit supporting documentation which reasonably demonstrates that a special master has jurisdiction to hear the merits of the case. This has always been true with the submission of medical records which tend to establish the requirements of subsections 11(c)(1)(A)–(C) and 11(c)(2),[2] and it applies equally to financial records, receipts, invoices, and the like which would tend to demonstrate that the petitioner incurred unreimbursed expenses in excess of $1000 as required in subsection 11(c)(1)(D)(i). Due to the more informal style of many Vaccine Act cases, the line between determining jurisdiction and deciding the merits becomes blurred. Still, this Court reiterates that, absent the submission of supporting documentation sufficient to persuade the special master of the Court's jurisdiction over the case, a petition will be dismissed for lack of jurisdiction.

█ The petitioner also claims that the special master has wrongly interpreted the word "incurred" to mean having actually paid money out of pocket. Yet, nowhere in the Dismissal Order did the special master require that $1000 worth of bills be actually satisfied or paid before filing the petition. The special master simply insisted that the *obligation* to pay an unreimbursable expense be incurred prior to the filing of the petition. Dismissal Order at 3, 4.

This coincides with the plain meaning of the statute, which is sufficiently understandable. Dictionaries define the word "incur" as "to render oneself liable to (damage)," "to become through one's own actions liable or subject to," "to bring upon oneself," VII Oxford English Dictionary 835 (2d ed. 1989), or similarly, "to have liabilities cast upon one * * * [t]o become liable or subject to, * * * as to incur debt," Black's Law Dictionary 768 (6th ed. 1990). One incurs an expense, therefore, at the moment one becomes legally liable, not at the moment when one pays off the debt, nor at the moment when one decides that an expense will become necessary one day in the future. *Quarles Petroleum Co. v. United States,* 213 Ct.Cl. 15, 22, 551 F.2d 1201, 1205 (1977) ("To incur means to become liable for or subject to; it does not mean to actually pay for."). The special master understood this definition and required nothing more.

On the other hand, the special master did require, and correctly so, that the relevant expenses be incurred *prior* to the date of filing. The consensus among the special masters seems to be that only expenses incurred prior to the filing date count toward the threshold, and this Court concurs. *May v. Secretary of Dep't of Health & Human Servs.*, No. 91–1057V, 1995 WL 298554 (Fed. Cl.Spec.Mstr. May 2, 1995); *Rodriguez v.*

---

**2.** These provisions require showings, often through medical records but sometimes through baby books, personal calendars, or other documentation, that a petitioner received a relevant vaccination, § 11(c)(1)(A), received it within the jurisdiction of the United States, § 11(c)(1)(B), and suffered a vaccine-related injury or death, § 11(c)(1)(C). The statute also requires petitioners to submit medical records covering prenatal and newborn care, childhood vaccinations, and post-injury care. § 11(c)(2).

Secretary of Dep't of Health & Human Servs., No. 90–2631V, 1995 WL 273952 (Fed. Cl.Spec.Mstr. April 25, 1995); *Hammond v. Secretary of Dep't of Health & Human Servs.,* No. 91–1238V, 1994 WL 59444 (Fed. Cl.Spec.Mstr. Feb. 15, 1994), *aff'd,* (Fed.Cl. July 12, 1994).

The internal logic of the Vaccine Act requires that the unreimbursable expenses be incurred before a petitioner files. Just as a petitioner must wait six months past the date of vaccination in order to tell if he or she "suffered the residual effects" of a vaccine-related injury, subsection 11(c)(1)(D)(i), so a petitioner must also wait until an adequate amount of unreimbursable expenses—an amount greater than $1000—have been incurred. The words "suffered" and "incurred" both appear in the past tense, convincing this Court that the financial liability must already exist by the date of filing.

■ In addition, the standard procedure envisioned by the Vaccine Act is that a petition will be more or less complete when submitted for filing, and that the petition will require only minor updates regarding prognosis and a life-care plan once entitlement has been established. If Mr. Black had correctly filed all of the required documentation in the first place along with his son's petition, then he would only have been aware of the initial $814.15 expense of September 22, 1990. The later expenses would not have occurred yet. Conceptually, even though the Chief Special Master granted Mr. Black leave to supplement his petition over three years later, the petition and its documentation were still necessarily viewed as having been presented to this Court on the date of the original filing. The special master did not err, therefore, in considering only the $814.15 as relevant for the jurisdictional requirements. Unfortunately, that amount did not exceed the $1000 statutory threshold level.

■ Nor may the petitioner use the $17,-427.10 in medical expenses to surpass the threshold amount. Those expenses were paid by the Indian Health Service, and therefore were not unreimbursable. As such, they cannot count toward the jurisdictional threshold. *See, e.g., Hayes v. Secretary of*

Dep't of Health & Human Servs., No. 93–287V (Fed.Cl.Spec.Mstr. Aug. 15, 1994), *aff'd,* (Fed.Cl. Dec. 22, 1994). The petitioner, having failed to establish the jurisdictional prerequisite of 11(c)(1)(D)(i), is not entitled to enter the Program, and his petition was correctly dismissed.

■ The petitioner's second argument posits that the interpretation the special master gave to subsection 11(c)(1)(D)(i) of the Vaccine Act leads to an unreasonable and absurd result. The petitioner maintains that he is squarely within the class of victims which the Vaccine Act was created to compensate: he is a victim of a vaccine-related injury and he will live with its serious consequences for the rest of his life. The petitioner contends that subsection 11(c)(1)(D)(i) was created to prevent frivolous claims or claims for only *de minimis* injury. The petitioner argues that he brings no frivolous claim and has certainly suffered far more than *de minimis* injury, and yet he would be barred from recovery under the special master's interpretation.

The petitioner asserts that the special master's interpretation, which this Court affirms, is unreasonable and produces an absurd result. The interpretation

> produces this absurd result because Petitioner's course of medical treatment and therapy did not compel out-of-pocket payment of unreimburseable [sic] expenses by Petitioner's parents prior to the time that Petitioner was procedurally required under § 16(a)(1) to file his compensation claim. Reason and common sense dictate that Congress did not intend to bar an otherwise eligible and needy child from benefit solely because of the timing of necessary expenditures for the child's recovery. A child is no more or less injured, no more or less in need, or no more or less entitled to compensation because unreimburseable [sic] expenses were * * * being incurred, after rather than before a petition was filed for benefits under the Act.

Pet'r Brief at 10. Subsection 16(a)(1) of the Vaccine Act provides time limitations on filing a petition for compensation.

This Court comprehends the petitioner's plight and recognizes the strange predicament in which the $1000 threshold places him. Several children may develop the same injury in response to a vaccination. Those who, like Daniel, are fortunate enough to have virtually all of their medical expenses paid for by the Government or by a private insurer will find it difficult to meet the $1000 threshold. Others may have equally excellent medical insurance coverage, yet they may incur hundreds or thousands of dollars' worth of unreimbursable travel expenses in order to reach adequate medical care. Some victims will incur costs near the beginning of their treatment, while others may incur costs at later stages, long after the statute of limitations has expired. Still others may have only partial or nonexistent insurance coverage, and will therefore find it relatively easy to establish that they incurred unreimbursable expenses. Those victims who gain entrance to the Program will be entitled to receive, in addition to their medical expenses, lost anticipated earnings, pain and suffering, attorneys' fees and costs. Subsection 15(a)(3), (a)(4), and (b). The others, such as Daniel, despite identical or similar injuries, will never receive these additional payments above and beyond medical expenses. Such disparity between otherwise similarly situated people, the petitioner argues, is an absurd result not intended by Congress, and a correct interpretation should not lead to such an outcome. *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) ("[T]here is no errorless test for identifying or recognizing 'plain' or 'unambiguous' language * * * absurd results are to be avoided * * * ."); *Steuer v. United States,* 207 Ct.Cl. 282, 293 (1975).

Nevertheless, the United States Supreme Court has also said that if a court finds statutory language to be plain and unambiguous, then "in the absence of 'a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.' " *Turkette,* 452 U.S. at 580, 101 S.Ct. at 2527 (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). This Court finds, as did the special master, that the language of the statute is not ambiguous. Moreover, this Court does not observe any "clearly expressed legislative intent to the contrary." While Congress intended to aid the needy and afflicted with this Act, Congress also specified which among the needy and afflicted would be entitled to compensation. For example, an injured person must be a United States citizen or have some other connection to the United States, such as contact with a certain manufacturer of vaccine or residence in a United States state or territory, before that person may recover under the Act. Subsection 11(c)(1)(B). One who suffers an injury for four months and then recovers, or who expends only $500 in unreimbursable expenses is obviously not eligible for the Program. Congress' use of a six-month and $1000 threshold to measure the severity of a victim's medical and financial hardship, although rough and inexact, still has some logic to it and is not wholly without reason.

As Special Master Abell noted,

Far from being an irrational or unreasonable pre-condition for compensation, this provision seeks to establish a minimum floor of severity of injury so that the Program's limited funds can be directed to those most in need of compensation. It may be argued, and with some persuasiveness, that measuring the severity of injury by how great a financial impact it causes is a particularly crude yardstick. It is, though, the most useful measure for the Act's purposes. If the Program's design were to make an injured child physically whole, indeed a pecuniary measurement of seriousness would be meaningless. However, all the court can do is seek to address those conditions that are not just physically severe, but *economically* severe. With that perspective, limiting compensation to those petitioners who can show that, prior to their appearance before the court, they have incurred at least $1000 in expenses for which there is no source of recompense is eminently reasonable. It is *those* petitioners who are most in need of, and entitled to, Program funds.

Dismissal Order at 2–3. This Court likewise finds that subsection 11(c)(1)(D)(i) of the Vaccine Act, and its interpretation given herein,

is neither absurd nor unrelated to the congressional purposes.

Third and finally, the petitioner invokes the United States Constitution to assert that the Vaccine Act, as interpreted by the special master below and now by this Court, denies the petitioner due process and equal protection of the laws.

■ Other than a bare and simple assertion that the special master's interpretation of subsection 11(c)(1)(D)(i) violated his rights under the Due Process Clause of the Fifth Amendment to the Constitution, the petitioner does not explain how or in what way he was denied due process.

> The central aim of due process doctrine is to assure fair procedure when the government imposes a burden on an individual. The doctrine seeks to prevent arbitrary government, avoid mistaken deprivations, allow persons to know about and respond to charges against them, and promote a sense of the legitimacy of official behavior.

The Oxford Companion to the Supreme Court of the United States 236 (Kermit L. Hall, ed., 1992).

In order to trigger an inquiry into a possible denial of due process of law, one must first be deprived of one's life, liberty, or property. This Court finds that, in this particular case, petitioner Daniel Black was not deprived of a property interest and so the Constitution did not guarantee him any particular procedure. Property, in addition to its common-law meaning of land and personal belongings, has come to include a few government-provided benefits, entitlements, or licenses, known as "new property." *Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (driver's license); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (welfare payments). Still, one must already possess a property interest before it can be taken away. The plaintiff in *Goldberg* was already receiving welfare payments when they were stopped, and the plaintiff in *Bell* already possessed a valid driver's license when it was revoked. The violation of their due process rights occurred by not granting them sufficient procedures to challenge the removal of these already vested property interests.

In contrast to this, alleged property interests which are anticipated, but have not yet been granted, cannot trigger a right to due process. *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (employment as a federal civil servant); *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (employment as a non-tenured professor at a state college). The United States Supreme Court noted that Mr. Roth did not have a constitutional property interest in his temporary professorship because neither his contract nor the relevant statute bestowed any right to contract renewal. Nor did the Constitution guarantee Mr. Kennedy any more property right in his civil service job than was provided for in the relevant Federal Government employment statute. "[W]here the grant of a substantive right is inextricably intertwined with the limitations on the procedures which are to be employed in determining that right, a litigant in the position of [Mr. Kennedy] must take the bitter with the sweet." *Arnett v. Kennedy*, 416 U.S. at 153–54, 94 S.Ct. at 1644.

> "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. * * *

> Property interests, of course, are not created by the Constitution. Rather they are * * * defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. Thus, the welfare recipients in *Goldberg v. Kelly* * * * had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them. * * *

> [Similarly, Roth's] 'property' interest in employment at [the University] was created and defined by the terms of his appointment."

*Board of Regents v. Roth*, 408 U.S. at 577–78, 92 S.Ct. at 2709 (citation omitted).

Any property interest Daniel Black might have possessed was only by virtue of the Vaccine Act as defined by its eligibility requirements. This is not a case where Daniel Black was found eligible to enter the Vaccine Program and then later removed without notice. Instead, he never met the eligibility requirements for benefits under the Vaccine Act, and therefore never had a property interest which the Government could take away.[3]

██ The petitioner also alleges a violation of his rights under the Equal Protection Clause of the Fourteenth Amendment to the Constitution. While the Equal Protection Clause speaks only of limiting the actions of the states and not those of the Federal Government, the United States Supreme Court has held that the Due Process Clause of the Fifth Amendment implicitly forbids most discriminations by the Federal Government just as the Equal Protection Clause restricts the states. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). The Supreme Court therefore generally applies the same standards of equal treatment to actions by Congress as it does to actions by state legislatures. A potential violation of equal protection arises whenever the Government treats one group differently than it treats another while it pursues some social goal. The task of equal protection law is to specify what degree of correspondence, or lack thereof, is necessary between the social goal intended and the classification system created to further that goal. Due to human fallibility, virtually every law will produce some overinclusion (including more individuals in a class than necessary to further the social goal) and some underinclusion (not including other individuals who ideally and theoretically should have been in order to further the goal).

The United States Supreme Court has identified and discussed several ways in which legislation classifies people. Some, such as racial classifications, call for strict scrutiny, where the fit between the social goal and the classification must be extremely close. Other classifications, such as those based either upon one's ability to pay for a service or on other aspects of the private economy, are social or economic legislation, in which case, the fit between the social goal and the classification merely requires some rational relation or logical connection. *Schweiker v. Wilson,* 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981); *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976) ("Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest."); *Railway Express Agency v. New York,* 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949); *Kester v. Horner,* 778 F.2d 1565, 1570 (Fed.Cir.1985); *Wheeler v. United States,* 768 F.2d 1333, 1337 (Fed.Cir.1985); *First Nat'l Bank of Oregon v. United States,* 215 Ct.Cl. 609, 571 F.2d 21 (1978); *Fredrick v. United States,* 205 Ct.Cl. 791, 797, 507 F.2d 1264, 1266 (1974).

The petitioner in the case at bar has suggested two ways in which subsection 11(c)(1)(D)(i) of the Vaccine Act, as interpreted, classifies individuals and discriminates unfairly against certain groups. First, the petitioner correctly points out that the subsection divides petitioners into two classes, depending on whether one's medical condition requires incurring unreimbursable expenses prior to or after the statutorily imposed deadline for filing a compensation claim. Such an arbitrary cut off, complains the petitioner, has no rational basis and wrongfully excludes petitioners like himself

---

**3.** Even if the petitioner did have a property interest of which he was deprived, he was still granted ample opportunity to be heard—the most important of procedural protections. The petitioner submitted two supplemental filings and multiple affidavits in response to prodding by the special masters and the Department of Health and Human Services. Thus, the requirements of the Due Process Clause were thoroughly satisfied. Furthermore, the Government may abridge the benefits available under the Vaccine Act which the petitioner is seeking; the benefits are not as substantively protected by the Constitution as are the right to privacy, the right to travel, or the right to vote.

from participation in the Program. Meanwhile others, who are, in a strange way, "fortunate" enough to be compelled to spend $1000 soon after their injuries, may enter the Program and recover various kinds of compensation. Although the petitioner is correct in his observation regarding both the overinclusion and underinclusion that the subsection engenders, such an outcome is not fatal to the provision. As an economic classification, the grouping must only display a rational relationship with its goal, and, as stated above, this Court finds that a rational basis does exist. The $1000 threshold is no more arbitrary than most statutes of limitations, and is a rational, although imperfect, gauge of an injury's economic impact.

In short, petitioner may have a general point that the statute's "$1000 requirement," accompanied by a time deadline for the expenditure and by a requirement that only "unreimbursed" expenses qualify, may in fact be a rather inexact method of measuring the seriousness of an injury. But that is simply the measure that Congress chose and embodied in the statute, and I must enforce that measure * * *.

*May v. Secretary of Dep't of Health & Human Servs.*, No. 91–1057V, slip op. at 4 (Fed. Cl.Spec.Mstr. May 2, 1995); *See also Rodriguez v. Secretary of Dep't of Health & Human Servs.*, No. 90–2631V, 1995 WL 273952 (Fed.Cl.Spec.Mstr. April 25, 1995) (rejecting a similar argument regarding allegedly more difficult burden upon petitioners receiving Medicaid or military medical care).

The petitioner also claims that the subsection unfairly discriminates against Native Americans, and in particular against Sioux Indians such as the petitioner. The petitioner has received, and will continue to receive, free health care from the Federal Government due to treaty obligations of the United States. For this reason, it may be more difficult for a petitioner who is a Sioux Indian to reach the $1000 threshold in order to qualify for the Program. Such a result, maintains the petitioner, is unfair and stems from an incorrect interpretation of subsection 11(c)(1)(D)(i).

Legislation, which classifies people into favored and nonfavored groups based upon race, is subject to "strict scrutiny." *Palmore v. Sidoti*, 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984); *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Anderson v. Martin*, 375 U.S. 399, 84 S.Ct. 454, 11 L.Ed.2d 430 (1964). But subsection 11(c)(1)(D)(i) contains no explicit racial classifications on its face and therefore cannot be struck down as patently unconstitutional. Nor has the petitioner shown any unlawful congressional intent to discriminate racially in passing the provision or in implementing it. *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *see also Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); *Lane v. Wilson*, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939); *Guinn v. United States*, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915); *Mahone v. Addicks Utility Dist. of Harris County*, 836 F.2d 921, 932–33 (5th Cir.1988); *United States v. Scott*, 521 F.2d 1188, 1195 (9th Cir.1975). The petitioner himself admits that his health care benefits are akin to a zero-deductible health care insurance policy which would similarly exclude individuals of other races as well. The most that the petitioner may allege is that the subsection as interpreted has a somewhat disparate impact upon individuals of Sioux ancestry. The Supreme Court, however, has held that a mere disparate impact does not violate the Equal Protection Clause of the Fourteenth Amendment.

[V]arious Courts of Appeals have held * * * that the substantially disproportionate racial impact of a statute or official practice standing alone and without regard to discriminatory purpose, suffices to prove racial discrimination violating the Equal Protection Clause absent some justification going substantially beyond what would be necessary to validate most other legislative classifications. * * * [T]o the extent that those cases rested on or expressed the view that proof of discriminatory racial purpose is unnecessary in making out an equal protection violation, *we are in disagreement.*

*Washington v. Davis*, 426 U.S. 229, 244–45, 96 S.Ct. 2040, 2050, 48 L.Ed.2d 597 (1976) (emphasis added); *see also Village of Arling-*

*ton Heights v. Metro. Housing Dev. Corp.* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977) ("[Disparate racial] impact alone is not determinative."). Even if the petitioner were to prove, therefore, that the Sioux are disproportionately excluded from the Vaccine Program, such a showing would not alone prove a violation of the Equal Protection Clause.

This Court finds, therefore, that petitioner's rights to due process and equal protection were not violated by the interpretation given to subsection 11(c)(1)(D)(i) by the special master. Such an interpretation was reasonable and in accordance with law.

## CONCLUSION

The Court, having considered the analysis set forth in the special master's decision, as well as the written arguments of counsel, is of the view that the special master's decision is legally correct as it stands. Therefore, this Court affirms the special master's Dismissal Order.

The Clerk of the Court is directed to enter judgment accordingly.