# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 10-243V
### Filed: August 27, 2013
### To be Published[1]

* * * * * * * * * * * * * * * * * * * * * * * * * *

ERICA FESTER, parent of     *
B.A.B., a minor,     *

           *        Advance Payment of
       Petitioner,     *        Interim Costs
       v.     *

           *
SECRETARY OF HEALTH     *
AND HUMAN SERVICES,     *

           *
       Respondent.     *

           *

* * * * * * * * * * * * * * * * * * * * * * * * * *

Erica Fester, Wrightsville Beach, N.C., *pro se* petitioner.
Voris E. Johnson, Esq., U.S. Dept. of Justice, Washington, DC, for respondent.

## DECISION DENYING PETITIONER'S MOTION FOR ADVANCE PAYMENT OF INTERIM COSTS[2]

**Vowell,** Special Master:

       On April 15, 2010, Ms. Erica Fester ["Ms. Fester" or "petitioner"], acting *pro se*, filed a petition for Vaccine Compensation under the National Vaccine Injury

---

[1] Because this published decision contains a reasoned explanation for the action in this case, I intend to post this decision on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, § 205, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to delete medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will delete such material from public access.

[2] In *Shaw v. Sec'y, HHS,* 609 F.3d 1372, 1375 (Fed. Cir. 2010), the Federal Circuit indicated that "a decision on attorneys' fees and costs is a decision on compensation" and, following the terminology used by that court, my action in this case is thus characterized as a "decision," albeit one not on the merits of the underlying petition.

Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[3] [the "Vaccine Act" or "Program"], on behalf of her son, B.A.B. Petitioner alleges that the combined measles, mumps, rubella, and varicella ["MMRV"] vaccine[4] which B.A.B. received on April 18, 2007 caused B.A.B. to suffer "a fever, a rash, uncontrollable crying, and loss of language."[5] Petition at 1. The petition was filed along with an application to proceed *in forma pauperis*. That application was granted on June 4, 2010.

In this decision, I deny petitioner's request for advance payment of interim costs in order to pay the retainer fee demanded by one of B.A.B.'s treating physicians before commencing work on an expert opinion regarding vaccine causation.

## I. Procedural History.

In the 14 months between the filing of the petition and the unusual request that is the subject of this order, efforts of the court, petitioner, and respondent's counsel in this case have focused on collecting a complete set of B.A.B.'s medical records, so that respondent and the special master could evaluate the merits of the case.[6] Additionally,

---

[3] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2006).

[4] On April 18, 2007, B.A.B. received one dose of the vaccine Proquad which contains the measles, mumps, rubella, and varicella vaccines. Petitioner's Exhibits ["Pet. Exs."] 3, pp. 2-3; 6, p. 15.

[5] Petitioner contends that B.A.B. "suffered an encephalopathy which was caused-in-fact by the MMRV vaccine" and resulted in B.A.B.'s "loss of prior skills and his current developmental delay." Petition at 1. Although petitioner contends that she is not claiming that the MMRV vaccine causes autism spectrum disorders ["ASDs"], medical records indicate that B.A.B. has a diagnosis on the autism spectrum. *Compare* Petitioner's Letter ["Letter"], filed Aug. 31, 2011, at 1-2 (reiterating that although B.A.B. has an autism diagnosis, her theory is that vaccines caused encephalopathy which resulted in a serious brain injury causing [B.A.B's] regression and delay in development) *with* Pet. Ex. 12, p. 1 (referring to B.A.B.'s diagnosis of autism at 18 months of age). Based on my experience on what is often termed this court's "autism docket," I am aware that some petitioners chose, in spite of an ASD diagnosis, to characterize their children's injuries as "encephalopathy," "acute disseminated encephalomyelitis," or as seizure disorders accompanied by developmental delay, based on a belief that claims alleging autism will not be compensated, but that claims alleging these other conditions may be compensated. Recharacterizing a condition as an "encephalopathy"—a term that can encompass conditions ranging from intoxication to a coma—when another diagnosis is more specific and appropriate does little to advance a vaccine injury claim. Whether the evidence supports vaccine causation of the actual condition from which the vaccinee suffers is the question before the special master in each case. In this case, petitioner acknowledges that her son has an autism diagnosis, but claims he has symptoms "uncharacteristic of a child with autism, and some may even be an (sic) impossible characteristics of a person with true autism." Letter, filed Aug. 31, 2011, at 1.

[6] Because the petition was filed without all the required medical records and an affidavit, the special master then assigned to this case ordered petitioner to complete the evidentiary record to support her claims. *See* Order, issued June 4, 2010. Petitioner filed some medical records and video evidence. *See* Pet. Exs. 1-15 (medical records), filed July 14, 2010; Pet. Exs. 16-17 (video evidence), filed Aug. 19, 2010. Two sets of records, those of Dr. Robert Perry and Dr. Karen Harum, were still missing at the time this case was reassigned to me on February 9, 2011. Petitioner filed Dr. Perry's records on April 14,

2

petitioner has attempted to obtain representation, without success. The special master originally assigned to this case and I have conducted numerous status conferences with petitioner, respondent's counsel, and B.A.B.'s father.[7]

The medical records are now largely complete. In her Vaccine Rule 4(c) report, respondent recommended against compensation. In support of her recommendation, respondent noted the statutory prohibition in § 13(a)(1) against a finding in favor of petitioner based on her claims alone, unsubstantiated by medical records or medical opinion, and pointed out that the medical records "do not contain a medical theory causally connecting vaccination and injury, nor do they provide a logical sequence of cause and effect showing that the vaccination was the reason for the injury." Respondent's Rule 4(c) Report ["Res. Report"], filed Sept. 10, 2010, at 9 (citing *Althen v. Sec'y, HHS*, 418 F.3d 1274, 1278 (Fed. Cir. 2005)). Respondent also noted the lack of a "reliable medical opinion demonstrating that [B.A.B.'s] MMRV vaccination either could be, or was the cause of [B.A.B.'s] alleged injuries." Res. Report at 9.

Petitioner responded to the Rule 4(c) report, providing her own recitation of B.A.B.'s medical history. She stated that "[i]t was the opinions of three doctors, Dr. Robert Perry, Dr. Karen Harum and Dr. Lynn Wagner [sic], that [B.A.B.] suffered from encephalopathy. All three could not rule out a vaccine injury, two stated that in their professional opinion, [B.A.B.] had received a vaccine injury." Response to Respondent's Rule 4(c) Report ["Response to Res. Report"], filed Feb. 8, 2011, at 3-4.[8] However, none of the filed medical records reflects these opinions regarding causation. *See* Res. Ex. A (medical records from Dr. Karen Harum); Pet. Ex. 12 (medical records from Dr. Lynn Wegner); and Pet. Ex. 18 (medical records from Dr. Robert Perry).

My own review of the evidence submitted to date discloses no evidence supportive of vaccine causation of B.A.B.'s condition. The records do not support petitioner's assertions regarding symptoms in close temporal proximity to B.A.B.'s 12 and 18 month vaccinations. *See infra* Section III, Part C.2.a. No record from any treating health care provider attributes B.A.B.'s condition to a vaccine injury.

---

2011. *See* Pet. Ex. 18. Because Dr. Harum was not responsive to petitioner's efforts to obtain B.A.B.'s medical treatment records (*see* Petitioner's Status Report ["Pet. Status Report"], filed Apr. 14, 2011, noting no response to several phone calls, messages, and email messages to Dr. Harum), I authorized respondent's counsel to sign and serve a subpoena in order to obtain and file those records. Doctor Harum is the same physician whose retainer fee is the subject of this order. Respondent filed Dr. Harum's medical records on June 17, 2011. *See* Respondent's Exhibit ["Res. Ex."] A.

[7] Although B.A.B.'s father is not named as a petitioner in this action, he has fully participated, at the request of Ms. Fester, in the telephonic status conferences in this case (most of which have been digitally recorded), and for this reason, some of my orders refer to "petitioners," rather than to "petitioner." Respondent has interposed no objection to his participation.

[8] The pages of this document are unnumbered, but this quotation appears on the bottom of the third and the top of the fourth pages of the document.

Nevertheless, in numerous status conferences and in her written filings, petitioner has expressed her firm belief that B.A.B.'s condition is the result of his MMRV vaccine at 12 months of age, and possibly the DTaP vaccine he received at 18 months of age. *See, e.g.*, Letter, filed Aug. 31, 2011, at 1-2.

Petitioner acknowledges that the report of a medical expert is necessary in order to prove her case,[9] and has suggested on several occasions that an expert should be provided for her. In my initial status conference, held on March 1, 2011, petitioner inquired about government funding of an expert, and seemed to expect that funding for an expert would be made available or that an expert would be appointed for her. I explained that, while interim costs were available and "costly experts" were one of the examples our appellate court had given as warranting an interim award, all of the decisions awarding interim fees and costs involved reimbursement, not advancement, of fees and costs. That is, interim costs had been awarded only after the expert had submitted a bill for services actually rendered, and had been paid by petitioners or their attorneys. I noted that the issue of advancing costs had arisen in one of my other cases, and in that case, respondent had objected to any award of costs in advance of petitioner's payment of such costs.

In a July 7, 2011 status report, petitioner reported her lack of success in finding an attorney.[10] She tied her lack of representation to lack of an expert evaluation, stating: "I believe it would be helpful in my search for legal representation to have an objective expert witness, who has examined [B.A.B.] and his medical records, write up a report complete with a summary indicating a probability of a specific cause for [B.A.B.'s] injury. I would imagine that at some point a similar witness for the Respondent will be provided by public funding or via the Court to review [B.A.B.'s] medical records." Status Report, filed July 7, 2011, at 1. "We are unable to pay for an expert witness and would hope that the Court could assist in this." *Id.*

Much of the ensuing July 28, 2011 status conference was focused on petitioner's status report comments. Petitioner confirmed that her status report statement should be construed as a request for the court to appoint an expert witness to assist her. I explained that it was petitioner's burden to support her claim of a vaccine injury. I also explained that independent medical examinations were occasionally performed, but their use was generally limited to resolving disputes among experts concerning a

---

[9] In my initial status conference with petitioner on March 1, 2011, I explained that once missing medical records were filed, petitioner would need to find an expert willing to opine on vaccine causation, and that a causation hearing would likely be necessary if she was successful in finding a doctor to opine. *See, e.g.*, Order, issued July 28, 2011, at 1.

[10] Petitioner indicated that she was looking for an attorney within a two-hour drive of her home because "it would be much more productive to have face to face meetings rather than phone conversations. . . ." Status Report, filed July 7, 2011, at 1. In a status conference on July 28, 2011, I encouraged her to broaden her search, noting that many, if not most, Vaccine Act petitioners are represented by attorneys who do not practice in the same geographical location as their clients.

diagnosis or the nature and extent of injuries for purposes of determining damages. I indicated that, based on the posture of her case,[11] I would not appoint an expert to conduct an evaluation of B.A.B.

During this status conference, we also discussed the use of interim costs to pay for an expert and how to go about finding an expert willing to opine. I noted that the law on payment of interim costs was not yet well-developed, and that there was no precedent in the Vaccine Program supporting payment of those costs in advance, but that I would hear any arguments she might make concerning such payment.

Although none of B.A.B.'s treating physicians had indicated that B.A.B.'s problems were vaccine-caused, I suggested that petitioner begin her search for an expert by approaching those physicians to see if they could suggest an expert who might be willing to review the case. If petitioner found an expert willing to review the case, she was to provide the court with information regarding the expert's qualifications, the expert's hourly rate, and how many hours the expert would expect to need to formulate an opinion. If the expert required some payment in advance of reviewing the case (a retainer fee), petitioner was directed to provide evidence concerning her inability to pay a retainer.[12] Finally, I indicated that I had no doubt about petitioner's good faith belief that vaccines were somehow responsible for B.A.B.'s condition, but the law required that I also find a reasonable basis for the claim in order to award any costs. *See* Order, issued July 28, 2011.

## II. The Request for Advance Funding.

A. Petitioner's Request for Advance Funding.

On September 26, 2011, petitioner notified the court that Dr. Harum had agreed "to develop an opinion as to the cause of" B.A.B.'s injury. Notice, filed Sept. 26, 2011, at 2. Petitioner indicated that Dr. Harum's requested rate was $300 per hour and that Dr. Harum had estimated it would take 30 to 40 hours to develop her expert report. *Id.* Petitioner requested that the court provide the funds necessary to pay Dr. Harum. *Id.*

---

[11] As discussed more completely in Section III, Part C.2 below, the filed medical records are not supportive of petitioner's claims of a reaction to the April 17, 2007 vaccinations. Her own statements, made prior to filing this claim, initially attributed B.A.B.'s condition to causes other than the MMRV vaccine, and first mentioned the measles vaccination as a cause in 2009. *See* Pet. Ex. 12, p. 6.

[12] Petitioner failed to provide this evidence until January 26, 2012 when she filed a response to my December 13, 2011 Order. In her response, petitioner indicated that she filed for bankruptcy on October 14, 2010, reported $4,792.00 in income on her 2010 income tax return, expected to report income of less than $10,000.00 on her 2011 income tax return, and was currently caring for B.A.B. full time as he could not attend school due to behavioral issues. Response, filed Jan. 26, 2012, at 2. Petitioner added that B.A.B.'s father once provided generous support but he had "suffered a life threatening injury at the end of 2010," was unable to work for a year, and was currently unemployed. *Id.*

5

I ordered petitioner to file Dr. Harum's curriculum vitae, as well as a statement from Dr. Harum indicating: (1) her willingness to opine; (2) the amount of any required retainer fee; (3) the date when Dr. Harum could complete her expert report; and (4) Dr. Harum's hourly rate for expert services in other cases. Order, issued Sept. 28, 2011, at 1.

During a status conference on December 9, 2011, I reiterated that petitioner needed to file all of the information concerning Dr. Harum identified in my September 28, 2011 Order, as well as evidence demonstrating petitioner's inability to pay for an expert. On January 26, 2012, petitioner filed additional medical records, a statement of completion, and the information concerning Dr. Harum. *See* Pet. Exs. 20-22.

In petitioner's exhibit 22, Dr. Harum indicated that: (1) she was willing to opine in this case; (2) she charges $300 per hour to testify as an expert or to prepare an expert report; (3) she estimated an expert report in this case would require approximately 20 hours of her time; and (4) she would charge a retainer fee of $600 (10% of the total anticipated fee). Pet. Ex. 22 at 7. In a February 24, 2012 status conference, respondent's counsel indicated that respondent would oppose an award of interim costs covering the requested retainer. I therefore urged petitioner to exhaust all other options for obtaining funds for the $600 retainer fee.

Respondent filed her written opposition to petitioner's request for advance payment of expert costs on March 8, 2012. *See* Respondent's Opposition to Petitioner's Request for an Advance of Interim Expert Costs ["Res. Opp."] at 1.

On April 13, 2012, petitioner reported that she was unable to secure funds for the retainer fee. Response to Respondent's Opposition to Petitioner's Request for an Advance of Interim Expert Costs ["Response to Res. Opp."] at 2. Petitioner reiterated her request for advance payment of interim costs. *Id.* at 5.

B. Arguments Advanced by the Parties Regarding Petitioner's Request.

    1. Petitioner's Position.

In essence, petitioner's arguments are equitable. She acknowledges that she cannot prevail in her claim without an expert opinion. Based on her financial need, she contends that the Program should provide advance funding of costs because there are no other alternatives available to her. Reading between the lines of her request, petitioner appears to be arguing that because respondent has access to tax-supported experts, she should as well, in the interest of fairness. Petitioner argues that "[t]he need for detailed affidavits by a medical expert is clear" and asserts that she is "unable to afford an expert witness." Response to Res. Opp. at 2. Furthermore, she claims that her ability to find an attorney to represent her is affected by the lack of an expert's

6

review. She asserts that she has "made every attempt to retain legal representation"[13] and to secure the funds necessary to obtain an expert report.[14] *Id.*

Petitioner believes that "respondent's use of the term 'scant evidence' [indicates] that [respondent] has made some kind of informed opinion as to the scientific authentication of the petitioner's claim." Response to Res. Opp. at 2. Petitioner requests a copy of "any such scientific evidence the respondent has obtained on her behalf in order to make such an opinion" and any expert report that respondent has. *Id.* at 2-3. Finally, petitioner questions "what the respondent believes a reasonable cost for an expert opinion might be" and argues that advance payment of Dr. Harum's $600 retainer is reasonable. *Id.* at 2.

2. Respondent's Position.

In opposing petitioner's request, respondent contends that interim fees and costs are not authorized until entitlement to compensation has been either awarded or denied; that costs must be actually incurred before they can be paid by the Program; that the record before me does not support a reasonable basis for this claim; that Dr. Harum's qualifications to provide an expert report are lacking; and that fees she proposes to charge have not been established to be reasonable. Res. Opp. at 1. Respondent does not address petitioner's position that the government's access to experts mandates a level playing field nor does she address the request for disclosure of the results of any medical review performed by respondent.[15]

---

[13] Whether petitioner has truly exhausted all efforts to obtain representation is not easily determined. With regard to her position that no attorney will take her case because of the lack of an expert report, I note that Vaccine Act practitioners routinely accept cases lacking an expert's report. Although, it is true that most of the attorneys who once represented autism petitioners have withdrawn from representation of clients who continue to pursue autism claims, the refusal to pursue these cases is not universal. Based on my own docket, which includes about one-half of the autism or similar neurological injury claims still pending in the Program, I am aware that at least half a dozen attorneys are still pursuing such claims. Several of these attorneys have taken over cases for *pro se* litigants. Nevertheless, for purposes of determining whether I have the authority to order advance payment of her expert's retainer fee, I will treat petitioner's statements regarding her efforts to obtain representation as correct.

[14] Petitioner explained her financial circumstances in a response filed on January 26, 2012. *See supra* at note 12. Petitioner also claims that she "has made every attempt to secure the necessary funds to produce an expert witness' opinion . . . [and] has been unable to do so," but fails to describe her efforts in any detail. Response to Res. Opp. at 2.

[15] Petitioner's request for disclosure of any medical review performed by respondent is **DENIED**. Until filed with the court as an exhibit or as an attachment to a Vaccine Rule 4(c) report, any medical review by respondent's expert would not be discoverable under the Rules of the United States Court of Federal Claims ["RCFC"]. RCFC 26(b)(3)(A)&(B); *see also* RCFC 26(b)(4)(B) (discussing draft reports); *Deseret Mgmt. Corp. v. U.S.*, 76 Fed. Cl. 88, 92-93 (2007) (discussing the application of the work-product privilege to RCFC 26(b)(3)).

## III. Analysis of the Arguments.

The Vaccine Act is extraordinarily generous in its provisions for payment of fees and costs. Motivated by a desire to ensure that petitioners have adequate assistance from counsel when pursuing their claims, Congress determined that attorneys' fees and costs may be awarded even in unsuccessful claims. H.R. REP. NO. 99-908, at 22 *reprinted in* 1986 U.S.C.C.A.N. 6344, 6363; *see also Cloer v. Sec'y, HHS*, 133 S.Ct. 1886, 1895 (2013); *Saunders v. Sec'y, HHS*, 25 F.3d 1031, 1035 (Fed. Cir. 1994). As Judge Lettow noted in *Davis*, "the Vaccine Program employs a liberal fee-shifting scheme." *Davis v. Sec'y, HHS*, 105 Fed. Cl. 627, 634 (2012). It may be the only federal fee-shifting statute that permits unsuccessful litigants to recover fees and costs. In more than 24 years of Vaccine Act litigation, very few unsuccessful litigants have been denied fees and costs awards, so long as jurisdictional requirements for payment were met.[16]

Ms. Fester seeks to extend that generosity by asking me to provide advance funding for the expert she has chosen. In essence, petitioner is saying that, because she cannot establish causation of B.A.B.'s case without an expert opinion and cannot afford to pay an expert, the Program should provide the funds in advance to enable her to retain an expert.

I analyze Ms. Fester's request by looking to the statute itself, its legislative history, the arguments of the parties, the requirements for an interim award of fees and costs, and the effects of granting or denying petitioner's request. I conclude that although the evidence supporting a reasonable basis for this claim is not strong, it is sufficient to support an award of interim costs once the costs have been incurred, but that I lack the authority to advance Program funds to petitioner for the purpose of retaining an expert.

A. The Statutory Compensation Scheme.

The Vaccine Act provides:

> If the judgment of the United States Court of Federal Claims on such a petition does not award compensation, the special master or court may award an amount of compensation to cover petitioners' reasonable attorneys' fees and other costs incurred in any proceeding on such petition if the special master or court determines that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought.

---

[16] *See Jessen v. Sec'y, HHS,* No. 94-1029V, 1997 WL 48940, at *4-5 (Fed. Cl. Spec. Mstr. Jan. 17, 1997) (providing a detailed discussion of the fee structure under the Vaccine Act and its effect on the behavior and motivation of attorneys practicing in the Vaccine Program).

§ 15(e)(1).

The statute explicitly provides for payment of reasonable attorney fees. Although it does not explicitly state that costs must be reasonable as well, context suggests, and caselaw mandates, that only reasonable costs may be paid. *See Perreira v. Sec'y, HHS*, 27 Fed. Cl. 29, 34 (1992), *aff'd*, 33 F.3d 1375 (Fed. Cir. 1994) (indicating the description of reasonable applies to both costs as well as attorneys' fees); *Gruber ex rel. Gruber v. Sec'y, HHS*, 91 Fed. Cl. 773, 796 (2010) (citing § 15(e)(1) and specifying that "[p]etitioners are entitled to compensation for reasonable costs incurred in bringing their Vaccine Act petition"). Special masters determine reasonable hourly rates for experts (a "cost") in the same manner in which reasonable hourly rates for attorneys are determined. *Sabella v. Sec'y, HHS*, 86 Fed. Cl. 201, 206 (2009).

The statute also requires unsuccessful litigants to demonstrate that their claim was brought in good faith,[17] a subjective standard, and upon a reasonable basis, an objective standard. *Perreira v. Sec'y, HHS*, No. 90-847V, 1992 WL 164436, at *1 (Cl. Ct. Spec. Mstr. June 12, 1992) (describing good faith as subjective and reasonable basis as objective), *aff'd*, 27 Fed. Cl. 29 (1992), *aff'd*, 33 F.3d 1375 (Fed. Cir. 1994).

The third statutory requirement, that the fees and costs must be "incurred in any proceeding on such petition," has been invoked to deny compensation for work performed on litigation in other courts, such as when a petitioner files a civil suit for a vaccine injury before filing a petition under the Vaccine Act. *See Stewart ex rel. Stewart-Sotelo v. Sec'y, HHS*, No. 06-287V, 2011 WL 5330388, at *22-25 (Fed. Cl. Spec. Mstr. Oct. 17, 2011) (citing § 15(e)(1)(b) and determining that "costs associated with previous, civil litigation unrelated to [the proceedings under the Vaccine Act] are not compensable"). Special Master Golkiewicz also discussed the meaning of incurred when he denied a fee award for research and legal work performed by a petitioner's spouse (an attorney) prior to retaining counsel familiar with the Vaccine Program. *Kooi v. Sec'y, HHS*, No. 05-438V, 2007 WL 5161800 (Fed. Cl. Spec. Mstr. Nov. 21, 2007). The main issue in the decision was whether the work done by Mr. Kooi was an "incurred" cost or unreimbursable "self-help" work. *Id.* at 1-2, 5. Both decisions involved requests for final fees and costs.

Here, respondent focuses on the word "incurred" to argue that costs may not be advanced before the work on the case is performed. The definition of "incurred" as used in § 15(e)(1) and applied to an application for interim costs appears to be an issue of first impression. This argument is addressed in more detail in Part E below.

B. May Interim Awards be Made before Entitlement is Determined?

---

[17] Absent some evidence to the contrary, good faith is presumed. *Grice v. Sec'y, HHS*, 36 Fed. Cl. 114, 121 (1996).

1. Interim Awards in General.

Although the statute itself is silent regarding interim awards, the Federal Circuit has held that such awards are permissible. *See Shaw v. Sec'y, HHS*, 609 F.3d 1372 (Fed. Cir. 2010); *Avera v. Sec'y, HHS*, 515 F.3d 1343 (Fed. Cir. 2008). To be eligible for an interim award, a petitioner must demonstrate not only the good faith and reasonable basis required of unsuccessful claimants, but such factors as "protracted proceedings," "undue hardship," and that the fees and costs sought are substantial. *Avera*, 515 F.3d at 1352. In *Shaw*, the Federal Circuit ruled that interim fees could be awarded in advance of a decision on the merits of the petition so long as the need for an interim award could be demonstrated and there was sufficient evidence for the special master to conclude that good faith and a reasonable basis existed. *Shaw*, 609 F.3d at 1375. The court further indicated that "[w]here the claimant establishes that the cost of litigation has imposed an undue hardship and that there exists a good faith basis for the claim, it is proper for the special master to award interim attorneys' fees." *Id.*

In both *Avera* and *Shaw*, the Federal Circuit noted that interim fees and costs need not be awarded in all circumstances. *Shaw*, 609 F.3d at 1375; *Avera*, 515 F.3d at 1352. The Federal Circuit explained that "[t]he special master may determine that she cannot assess the reasonableness of certain fee requests prior to considering the merits of the vaccine injury claim." *Shaw*, 609 F.3d at 1377. Even if a petitioner can establish the statutory good faith and reasonable basis requirements for payment of fees for her as yet unadjudicated claim, the petitioner still must show why an interim award is appropriate. *See Avera*, 515 F.3d at 1352 (holding that although the Vaccine Act allows for interim awards, an award was not appropriate in that case). The factors that delineate when an interim award is appropriate remain somewhat amorphous. The Federal Circuit has indicated only that an interim award is appropriate when, as stated in *Shaw,* "the cost of litigation has imposed an undue hardship," or, as stated in *Avera*, "proceedings are protracted" or "costly experts must be retained." *Shaw*, 609 F.3d at 1375; *Avera*, 515 F.3d at 1352.

2. Revisiting *Shaw*.

In spite of *Shaw*, respondent contends, citing § 15(e)(1), that interim fees and costs are not authorized under the Vaccine Act unless entitlement to compensation has been either awarded or denied. Res. Opp. at 3. Respondent bases her argument on the language "[i]f the **judgment** . . . on such a petition does not award compensation" (emphasis added), contained in § 15(e)(1) and refers to this argument as her statutory argument. Res. Opp. at 3-4. Respondent contends that the Federal Circuit's holding in *Avera* is consistent with her position because a decision on entitlement had been made in that case. Res. Opp. at 4-6.

The first line of the statute appears to support respondent's position that such awards may not be made until after judgment on the merits, implying that the discretion to award fees and costs to unsuccessful litigants does not attach until after judgment

has issued. By implication, a petitioner is not "unsuccessful" until a determination of the merits of a petition has occurred. However, this reading cannot be reconciled with the panel decision in *Shaw* in which the Federal Circuit held that "the Court of Federal Claims has jurisdiction to review interim fee decisions prior to the decision on the merits of the underlying claim." *Shaw*, 609 F.3d at 1376. Thus, the Circuit rejected implicitly respondent's position here that a judgment on the merits is necessary before fees and costs can be awarded.

Respondent acknowledges that "a number of special masters" and Judge Bruggink at the Court of Federal Claims ["CFC"] have relied on the Federal Circuit's holding in *Shaw* to reject respondent's statutory argument, but she contends that she failed to present this statutory argument to the Federal Circuit in *Shaw*. Res. Opp. at 6. Respondent further contends that her failure to raise this statutory interpretation argument in *Shaw* does not prohibit her from raising it in this case. Res. Opp. at 6 (citing *United States vs. Mendoza*, 464 U.S. 154, 162 (1984)). Respondent also argues that the panel in *Shaw* failed to address an earlier decision by another panel (*Martin v. Sec'y, HHS*, 62 F.3d 1403 (Fed. Cir. 1995)), a decision which respondent interprets as requiring a judgment on the merits before a special master can award fees and costs. Res. Opp. at 7.

3. Conclusion on Interim Awards in the Absence of an Entitlement Decision.

I reject respondent's position that a decision on entitlement is required before interim costs may be awarded. Notwithstanding respondent's arguments, I read *Avera* and *Shaw* together as indicating that interim fees may be awarded before entitlement is determined, provided that good faith and a reasonable basis for the claim are demonstrated on the record and adequate justification for making an interim award exists.

C. Has Petitioner Established Adequate Justification for an Interim Award?

To justify an interim award of fees and costs, a petitioner must demonstrate that her claim was brought in good faith and upon a reasonable basis. Additionally, because she is seeking an interim award, she must demonstrate circumstances warranting an interim award. Although the precise parameters of these circumstances have not yet been defined, the Federal Circuit has referred to "protracted proceedings," "costly experts," and "undue hardship." *Avera*, 515 F.3d at 1352; *Shaw*, 609 F.3d at 1375. Whether these factors are absolute requirements or merely examples of circumstances warranting an award of interim costs (a process that, of necessity, competes for time and attention with the process of deciding entitlement to compensation and awarding damages to petitioners who prevail, and which largely benefits the attorney rather than the petitioner) remains unclear. I need not address this issue in Ms. Fester's case because she is clearly asserting that she is experiencing "undue hardship."

11

1. Good Faith.

Respondent "does not dispute that petitioner filed the claim in good faith." Res. Opp. at 9 n.7. I agree that petitioner has a good faith belief in the merits of her case.

2. Reasonable Basis.

Whether this claim has a reasonable basis is more difficult to ascertain. Respondent argues that it does not, Res. Opp. at 9-10, and has moved to dismiss the case because the evidentiary record does not support petitioner's contentions. Res. Report at 8-9.

For purposes of this motion, respondent also contends that I cannot yet determine if a reasonable basis for this claim exists. Res. Opp. at 10. Respondent points out that the medical records do not support petitioner's claim that B.A.B. suffered an encephalopathy caused by his MMRV vaccination. *Id.* at 9. Although petitioner has indicated that Dr. Harum's expert opinion will support her claim, respondent argues that, in the absence of such a report, "it is premature" for me to determine that a reasonable basis exists. *Id.* at 9-10.

I agree there is scant evidence to support a reasonable basis for this claim, based on the evidence filed to date. The following summary of the medical records illustrates the contradictions between the assertions made in the petition and the records filed.

a. Analyzing Petitioner's Assertions in Light of the Filed Medical Records.

Petitioner contends that the MMRV vaccine which B.A.B. received on April 18, 2007 caused B.A.B. to suffer "a fever, a rash, uncontrollable crying, and loss of language." She also alleges that B.A.B. "suffered an encephalopathy which was caused-in-fact by the MMRV vaccine" and resulted in B.A.B.'s "loss of prior skills and his current developmental delay." Petition at 1.

The medical records present a different picture. After the April 2007 vaccinations, B.A.B. was next seen by health care providers some three months later in the emergency room for a laceration to his upper lip.[18] No mention was made of any health or behavior concerns since his last health care visit, but, given the nature of the treatment sought, behavioral concerns might not be raised.

---

[18] Although petitioner characterized this laceration as "gaping," the ER staff described a one cm superficial laceration which was closed using steri-strips. Pet. Exs. 4, p. 17; 5, pp. 1, 5. The next day, B.A.B. was seen by his pediatrician who described the injury as a shallow laceration with a scab already formed, adding "[t]here is no evidence that it was ever gaped open." Pet. Ex. 6, p. 3.

B.A.B. was next taken to his primary care provider in mid-August 2007, when he was about 15 months of age, for a high fever the night before and some increased fussiness. He was diagnosed with a viral syndrome. Pet. Ex. 6, p. 3. No mention was made of any earlier high fever, uncontrollable crying, or loss of language or other skills.

Ms. Fester called the pediatrics office in mid-September, 2007 complaining of B.A.B.'s fever[19] and two weeks of bloody nasal discharge. She indicated that B.A.B. was acting normally, but had less appetite. Pet. Ex. 4, pp. 13-15. B.A.B. was seen at the practice two days later. His eardrums were red, but there was no discharge. Once again, he was diagnosed with a probable viral syndrome. Pet. Ex. 6, p. 4.

At B.A.B.'s 18 month well child visit on October 19, 2007, he was noted to say at least three words, in addition to "mama" and "dada," but his mother was concerned about his speech development. She reported that his speech was at the same level as it was at one year of age. B.A.B. was "[s]aying quite a few words," Pet. Ex. 6, p. 4, but they were the same words he had previously used and he did not seem to be interested in acquiring new words. She also reported that although he appeared to have normal hearing, B.A.B. was not responding to his name.[20] *Id.*, p. 4. The pediatrician suggested waiting until January, 2008, before taking any further action. *Id.* No prior side effects following immunizations were noted, and B.A.B. received a DTaP vaccination at this visit. Pet. Exs. 3, pp. 2-3; 6, p. 16.

B.A.B.'s records contain a handwritten entry for November 6, 2007, but I cannot decipher it. Pet. Ex. 6, p. 4. On November 23, 2007, B.A.B. was scheduled for an influenza booster, but he had a fever the night before, with a temperature of 104° Fahrenheit, and he seemed lethargic. On examination, B.A.B. was cranky but easily consoled, and his right ear was normal except for a slight redness. *Id.* During the visit, the pediatrician questioned petitioner about B.A.B.'s speech because he did not speak at all during the examination. Ms. Fester reported that B.A.B. did not point and did not try to show things to his parents.[21] This pediatrician suggested investigating the possibility of ASD. Pet. Ex. 6, p. 4.

Later that same day, Ms. Fester called to report that B.A.B. was running a fever of 103.5°, had blotchy skin, an intermittent blue tinge to his lips, and a runny nose. Pet.

---

[19] She indicated it had been 102° in the morning, and reduced to 99° after she gave B.A.B. Motrin.

[20] Both the plateau in language development and the lack of response to his name are early symptoms of an ASD, and are often the first symptoms noticed by parents or other caregivers. *See White v. Sec'y, HHS*, No. 04-337V, 2011 WL 6176064 (Fed. Cl. Spec. Mstr. Nov. 22, 2011) (discussing symptoms of ASDs).

[21] Lack of pointing to share, as opposed to pointing to express wants or needs, is an early symptom of ASD often noted by caregivers or health care providers. *See White*, 2011 WL 6176064, at *7 (discussing this early symptom of ASDs).

Ex. 4, pp. 11-12.  He was seen in the office that evening.  His pulse oxygen level was 96-98% on room air, and he was described as alert and interactive, but crying.   He was assessed as having a possible reaction to the antibiotic given for treatment of his otitis media.  Pet. Ex. 6, p. 5.

B.A.B. continued to run a fever and was seen again on November 29, 2007.  Ms. Fester also shared concerns about his behavior, and reported that she had been in touch with an ASD diagnosis and treatment program to arrange for an evaluation.  Pet. Ex. 6, p. 5.  With regard to his fevers, she was worried that B.A.B. might have leukemia instead of otitis media or a viral illness.  She reported that he seemed to be feeling well in general and was eating and drinking well.  She also expressed concern about possible seizure activity, as he sometimes stiffened and appeared unresponsive, but he did not shake and was not incontinent after the episodes.  She observed that B.A.B. would wake up screaming during the night and during naps.  She wondered if his history of high fevers might have affected his brain.  *Id.*

The physician noted that many of Ms. Fester's numerous concerns appeared to have been prompted by her internet research and that she was quite preoccupied with what she saw as B.A.B.'s behavioral disorders.  Pet. Ex. 6, p. 5.  He explained that a temperature of under 100.4° was not considered a fever and that the complete blood count performed in April had been normal.  *Id.*, p. 6.  He reassured petitioner that B.A.B.'s behavior was "alert and energetic" and he was not exhibiting "any signs of systemic illness."  *Id.*  He encouraged petitioner to rely only on resources recommended by "reliable health care professionals."  *Id.*

B.A.B. was evaluated for possible autism by North Carolina's Children's Developmental Services Agency ["CDSA"] on December 6, 2007.  Ms. Fester reported that he had reached most milestones early, that he was able to identify shapes and colors at three months of age,[22] and that he was talking in two to three word phrases[23]

---

[22] In a short video clip filed as Pet. Ex. 16, B.A.B., then six months of age, was shown pointing to the green card when presented with both a red and green card.  However, Ms. Fester was required to make her request several times before B.A.B. pointed and, there is no evidence that the way the cards were presented to B.A.B. was ever varied.  Thus, other than this parental report, there is no indication that B.A.B. knew his colors at three months of age.

[23] Later, in the same report from B.A.B.'s December 6, 2007 evaluation, it is recorded that B.A.B. was using two to three words at eight to nine months of age, rather than using two to three word phrases.  Pet. Ex. 7, p. 1.  The report of two to three words, rather than the use of phrases, is more consistent, with both normal child development and petitioner's report to B.A.B.'s pediatrician about his failure to progress in language at B.A.B.'s 18 month well child visit.  NELSON TEXTBOOK OF PEDIATRICS (19th ed. 2011) ["NELSON'S"], at 28, 30-31, 34 (noting that the average child begins using repetitive consonant sounds by 10 months of age and uses a few words other than "mama" and "dada" by one year of age, four to six words by 15 months of age, and multiple word phrases beginning at two years of age).  The number of words in a sentence generally equals the age of the child in years.  *Id.* at 34.  Although B.A.B. was reported to have "lots of words" at his nine month checkup, Pet. Ex. 6, p. 14, a later report suggests that he was echoing words rather than using them independently and spontaneously at this point.  *See* Pet. Ex. 7, p. 5.

at eight to nine months of age.  Pet. Ex. 7, p. 1.  She also reported that he stopped talking at all at around 10 months of age.  *Id.*

Based on her report, B.A.B.'s plateau in language occurred about two months before the allegedly causal MMRV vaccine.  B.A.B.'s parents attributed his loss of verbal and social skills to a sudden high fever[24] of 107.5°.  Pet. Ex. 7, p. 1.  B.A.B.'s father expressed concern about his son's fascination with the ceiling fan, pulling books off shelves, and inability to cease an activity until physically stopped.  *Id.*, p. 2.  Ms. Fester noted that he was a picky eater.  Based on their internet research on autism, they had recently placed B.A.B. on a gluten-free diet, with improvement in social behavior and talking as a result.  *Id.*, p. 1.  B.A.B. was assessed with delays in social skills and language, but was not definitively diagnosed with ASD.  *Id.*, p. 3.

Later that same day, B.A.B. was seen by his pediatrician.  The reason for the visit was a red to pink rash on his torso, and a red, dry, scaly rash on his thighs.[25]  Ms. Fester reported that she had placed B.A.B. on a gluten-free diet, and that an evaluation earlier that day had assessed B.A.B. as on "the low end" of autism spectrum disorders, with speech at an eight-month level.  Pet. Ex. 6, p. 6.  The rash was assessed as likely eczema.  *Id.*

---

[24] There were no fevers reported for almost four months after B.A.B.'s April 2007 vaccinations, administered when he was one year old.  However, a fever that allegedly reached 107° occurred when B.A.B. was about eight and one half months old, more than three months before B.A.B.'s MMRV vaccination.  Ms. Fester called the afterhours service at the pediatrician's office on December 31, 2006, reporting that a fever began at about 8:20 PM and reached a peak at 102.5° measured tympanically.  B.A.B. was drinking, eating, and urinating normally, and had not been vomiting or experiencing diarrhea, and had no rash.  His father had been ill recently.  Pet. Ex. 4, pp. 22-26.

The next day, B.A.B.'s father placed a call to the pediatric practice's afterhours number, indicating that he was at the emergency room with B.A.B., who had a fever of 107°.  He wanted one of the pediatricians to meet him in the emergency room.  *Id.*, pp. 19-21.  At the emergency room, B.A.B.'s temperature was recorded as 105.9°, and he was observed to have decreased activity, excessive crying, congestion, and nasal discharge.  Tylenol and Motrin were administered.  Pet. Ex. 5, pp. 6-8.  B.A.B.'s father reported that his pediatrician had agreed to meet them at his office, and he and the child left the emergency room against medical advice.  B.A.B. was then seen at the pediatrician's office.  He had a minimal runny nose and cough.  He was well-appearing, but tired and sleepy.  The physician assessed B.A.B. as likely having a viral fever.  Pet. Ex. 6, p. 2.

On January 3, B.A.B. was seen again by the same physician.  B.A.B. continued to have a runny nose, but was well-appearing and in no apparent distress.  A complete blood count confirmed the physician's suspicion that the fever was viral in nature, as the blood results were "reassuringly viral." B.A.B. had an ulcer on his tongue and one papule on his wrist.  *Id.*

[25] Although petitioner contends that B.A.B. experienced a rash as the result of his April 2007 MMRV vaccination, this was the first report of any rash after the 12 and 18 month immunizations.  His mother also indicated that he routinely developed rashes after fevers.  Pet. Ex. 6, p. 6.

In histories provided to specialists diagnosing, evaluating, or treating B.A.B. from January 2007 to July 2008, his parents never attributed his speech stagnation or regression to his vaccinations. *See, e.g.*, Pet. Exs.10, p. 3 (speech therapy evaluation on January 17, 2008, in which his parents reported that B.A.B. was using more words at one year of age, but had since stopped using them and indicating that there were no significant events or changes at the time); 7, pp. 5-6 (CDSA evaluation on January 24, 2008, in which his parents reported a history of mimicking words at six months of age, and regression beginning "after roseola fever with temperature of 107.5°"); Res. Ex. A, p. 113 (an email message to Dr. Harum on July 18, 2008, in which B.A.B.'s father reported that B.A.B. went from being able to say "I love you" at 10 months of age to only one or two words in November 2007, and which indicated that he had no problems after the 107.5° fever, but had developed changes five to six months later). The first mention of any fever or regression associated with his MMRV vaccination did not occur until April 14, 2009. *See* Pet. Ex. 12, p. 6.

### b. Determining if a Reasonable Basis Exists.

Whether these deficiencies in petitioner's case are sufficient to conclude that the claim lacks a reasonable basis is a difficult call. Certainly, there is nothing in the record to date to suggest vaccine causation. However, I have seen many cases in which an expert opined in favor of vaccine causation, in spite of the lack of such indications in the medical records, and it is not uncommon for fees and costs to be awarded at the conclusion of a case in that procedural and evidentiary posture.

Petitioner filed B.A.B.'s claim a few days before the statute of limitations would have expired, assuming that B.A.B. had the relatively immediate reaction to his April 18, 2007 vaccinations claimed.[26] Thus, giving petitioner the leeway normally accorded to petitions filed on the eve of the expiration of the statute of limitations, it is appropriate to conclude that petitioner had a reasonable basis to file the petition. *See Hamrick v. Sec'y, HHS*, No. 99-683V, 2007 U.S. Claims LEXIS 415, at *14 (Fed. Cl. Spec. Mstr. Nov. 19, 2007) (discussing the more liberal standard for finding a reasonable basis for petitions filed just prior to the expiration of the Vaccine Act's statute of limitations).

However, the Federal Circuit has required something more than "unsupported speculation" to continue to pursue a petition. *Perreira v. Sec'y, HHS*, 33 F.3d 1375, 1377 (Fed. Cir. 1994); *see also Hamrick*, 2007 U.S. Claims LEXIS 415, at *15 (distinguishing reasonable basis needed to file a petition from that needed to continue a claim). If petitioner's causation theory is not premised on facts supported by the record, or is not grounded in reputable medical evidence, his (or his expert's) espousal of that theory is insufficient to maintain a reasonable basis. *See Perreira*, 27 Fed. Cl. at 33-34,

---

[26] The petition was filed on April 15, 2007, just three days short of 36 months after administration of the allegedly causal vaccinations.

*aff'd*, 33 F.3d 1375 (Fed. Cir. 1994); *Stevens v. Sec'y, HHS*, No. 90-221V, 1992 WL 159520, at *4 (Cl. Ct. Spec. Mstr. June 9, 1992).

Many cases filed in the Vaccine Program suffer from the same infirmities as does this one. That is, most petitions, like the one in the instant case, are filed based on a belief in vaccine causation, unsupported by the medical records or by expert opinion. In the typical Vaccine Act case, it takes months for petitioners to produce sufficient medical records to allow respondent and the special master to assess whether the claim is colorable. Only rarely is a petition accompanied by sufficient medical records to permit respondent to file a substantive report as contemplated by Vaccine Rule 4(c) within 90 days of the petition's filing. Even more rarely is a petition accompanied by an expert report or a statement from a treating physician regarding vaccine causation. Yet, in the vast majority of cases, respondent does not challenge the reasonable basis for the claim when petitioners seek payment of final fees and costs for an unsuccessful claim.

Fees and costs have been paid, often without opposition by respondent, in cases in which petitioners have been unable to find an expert willing to opine as well as in those in which petitioners have obtained an unfavorable opinion. Experts have been paid simply to review and summarize the medical records. *Savin v. Sec'y, HHS*, No. 99-537V, 2008 WL 2066611, at *3-4 (Fed. Cl. Spec. Mstr. Apr. 22, 2008); *Lamar v. Sec'y, HHS*, No. 99-583V, 2008 WL 3845165, at *12-13 (Fed. Cl. Spec. Mstr. July 30, 2008).

In this case, a physician who has seen and treated B.A.B. in the past has agreed to opine on whether vaccines are responsible for his condition.[27] In the absence of any evidence that she is doing so for reasons unrelated to the vaccine injury claim process, I cannot distinguish this case from hundreds of those in the posture of final fees in which fees and costs have been paid, in spite of the lack of an expert report or evidence of vaccine causation in the medical records filed.

3. Is the Cost Reasonable?

Respondent asserts that I cannot determine if the interim costs sought by petitioner are reasonable. Res. Opp. at 10; *see also* § 15(e)(1). According to respondent, the petitioner is, in essence, asking me to pre-certify Dr. Harum as an expert and pre-approve her rate. Res. Opp. at 10-11 and n.9. Respondent contends that I do not have enough evidence to make such a determination without seeing Dr. Harum's report. *Id.* at 11.

---

[27] It is a matter of some concern to me that this particular physician, Dr. Harum, earlier refused to provide petitioner with a copy of B.A.B.'s medical records. To obtain Dr. Harum's records after she was not responsive to petitioner's requests, I authorized respondent's counsel to sign and serve a subpoena on Dr. Harum. *See* Order, issued Apr. 21, 2011.

It is true that Dr. Harum does not have a "track record" as an expert in the Vaccine Program, and based on the somewhat vague statements in the Notice filed September 26, 2011 and Pet. Ex. 22, I cannot determine if she has ever testified as an expert witness regarding causation of an injury or has filed an expert report in any other court. She is, however, a board certified pediatrician, Pet. Ex. 22 at 3, and has seen and treated B.A.B. There is no prohibition in the Vaccine Program against treating physicians testifying as experts. In fact, special masters are abjured to carefully consider the opinions of treating physicians when considering whether vaccine causation has been established. *Althen*, 418 F.3d at 1280; *Capizzano v. Sec'y, HHS*, 440 F.3d 1317, 1326 (Fed. Cir. 2006). While her training and experience appear to be less than that of most experts who have testified regarding vaccine causation of ASDs or encephalopathies, generally speaking, her qualifications would affect the weight given her opinion under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) rather than its admissibility.[28] Her training and experience would certainly be a factor in assessing the hourly rate to be awarded.

Based on my experience in the Vaccine Program, most experts who require retainers before rendering an opinion request more money in advance than does Dr. Harum. The average retainer amount in the fees and costs applications I have reviewed, which involve experts in a variety of disciplines, is nearly twice what Dr. Harum is requesting. The requested retainer is, therefore, quite reasonable.

Respondent argues that paying the retainer amount would equate to pre-approval of Dr. Harum and her rate. I do not agree. Approving payment of the retainer sought by Dr. Harum does not commit me to accept Dr. Harum's hourly rate or her estimate of the total cost involved. Thus, should Dr. Harum's report be of poor quality or the additional hours requested be unreasonable, advance payment of a retainer does not commit the court to approve additional funds. However, whether Dr. Harum's hourly rate and the number of hours sought are reasonable is secondary to determining whether petitioner can receive Program funds for Dr. Harum's services in advance of expending payment to acquire those services.

---

[28] Although special masters can decline to consider an expert's opinion based on lack of qualifications and other factors, such cases are rare. *Veryzer v. Sec'y, HHS,* No. 06-522V, 2010 WL 2507791 (Fed. Cl. Spec. Mstr. June 15, 2010) (granting respondent's motion to exclude petitioner's expert report). More frequently, special masters consider all of the evidence and testimony produced by the parties, and rather than using the *Daubert* criteria to screen out evidence at the gate to the courthouse, they use the non-exhaustive *Daubert* criteria to determine what, if any, weight to give to expert opinions. *Terran v. Sec'y, HHS,* 195 F.3d 1302, 1316 (Fed. Cir. 1999) (approving a special master's use of the *Daubert* factors "as a tool or framework for conducting the inquiry into the reliability of the evidence"); *Cedillo v. Sec'y, HHS,* 617 F.3d 1328, 1339 (Fed. Cir. 2010) (noting that special masters are to consider all relevant and reliable evidence filed in a case and may use *Daubert* factors in their evaluation of expert testimony); *Davis v. Sec'y, HHS*, 94 Fed. Cl. 53, 67 (2010) (describing the *Daubert* factors as an "acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted . . . by special masters in vaccine cases").

D. Do the Circumstances of this Case Justify an Interim Award?

1. Protracted Proceedings.

This petition has been pending for about 40 months. During the first 15 months, the focus of the efforts of petitioner, respondent, and two special masters was on obtaining sufficient medical records to evaluate the claim. The focus then shifted to petitioner's efforts to obtain representation and to find an expert willing to opine. Twenty-four months after filing her claim, petitioner reported that she had exhausted her effort to obtain funding for her expert's retainer fee, and requested that I rule on her application for interim costs.[29]

In *Avera,* the Federal Circuit included "protracted proceedings" as a basis for awarding interim fees and costs but did not elaborate on what amount of time would be considered protracted. *Avera*, 515 F.3d at 1352. The Circuit held that an interim award was not warranted in that case in part because petitioners only sought the award pending appeal. Following the Federal Circuit's logic, I have awarded interim fees and costs in cases in which further proceedings were likely to be protracted, such as those involving withdrawal of an attorney, and when the damages phase is expected to take some time. Other special masters have awarded interim fees and costs in cases pending for shorter periods of time. *See, e.g., Bear v. Sec'y, HHS*, No. 11-362V, 2013 WL 691963 (Fed. Cl. Spec. Mstr. Feb. 4, 2013) (awarding interim fees in a case pending for 19 months). In these cases, the request for interim fees and costs accompanied a motion to withdraw as attorney of record.[30] While petitioner's claim has been pending for longer than the statutory "opt out" period, whether this case qualifies as "protracted" is not clear. *See* § 21(b) (for a description of the statute's "opt out" period).

2. Undue Hardship and Costly Experts.

Before an interim award is appropriate, petitioners must show "that they have suffered undue hardship." *Avera,* 515 F.3d at 1352; *accord. Shaw,* 609 at 1375. Although neither *Avera* or *Shaw* contains an example of what undue hardship would entail, the Federal Circuit in *Avera* specifically held that undue hardship did not exist

---

[29] Unfortunately, my decision on her application has been unduly delayed by entitlement hearings in other cases and efforts to resolve informally approximately 1,000 outstanding final attorney fee applications in the "*Cloer* hold cases" (cases in which respondent had challenged the award of fees and costs because the claims were untimely filed). At the February 24, 2012 status conference, I did inform petitioner that adjudication of her interim costs application was likely to be delayed. I regret this decision was delayed longer than I had anticipated.

[30] The fact that an attorney has filed a motion to withdraw has been viewed as circumstances which warrant an interim fee award. *Wood v. Sec'y, HHS,* 105 Fed. Cl. 148, 154 (2012). *But cf. McKellar v. Sec'y, HHS,* 101 Fed. Cl. 297, 302 (2011) (holding that "the mere fact that an attorney plans to withdraw is not necessarily a hardship that triggers an award of interim attorneys' fees and costs").

because "the amount of the fees here was not substantial; appellants had not employed any experts; and there was only a short delay in the award pending the appeal." *Avera,* 515 F.3d at 1352. Thus, the Circuit appeared to focus on the hardship of carrying unreimbursed costs for extended periods rather than the financial situation of the petitioner or counsel.

Whether expert costs are "expensive" can be evaluated either objectively, i.e., considered in light of other expert costs in the Program, or subjectively, i.e., based on petitioner's counsel or a *pro se* petitioner's ability to carry those costs until final resolution of the case. It makes considerable practical sense to evaluate such costs on an objective basis. A petitioner or petitioner's counsel who has expended $100,000 in expert costs in a case that may be on review or appeal for several more years certainly presents a more compelling case for an interim award than one who has only a $1,000 expert retainer cost outstanding.[31] To look at such cases subjectively would require delving into a law firm's or expert's financial situation,[32] a requirement that would likely be repellant to the court and law firm alike.[33] Using an objective standard, the cost of Dr. Harum's retainer is not expensive. It does, however, represent a hardship to petitioner.[34]

Whether it constitutes an "undue" hardship is less clear, particularly when viewed in light of the statutory requirement to file a petition supported by evidence of vaccine causation.

---

[31] In more than seven years of experience as a special master, I am aware that a retainer is often the only expert witness expenditure actually paid at the time a case is resolved without the need for testimony. Because of the relative certainty that expert costs will ultimately be paid even in cases where causation is not established, some experts have been willing to opine based on only a retainer payment, and await the award of fees and costs at a later date in order to collect the remainder of their expert fee.

[32] When considering the hourly rate which should be awarded to an attorney, the argument that a law firm's profitability should be examined has been rejected on the grounds that this further examination was not relevant to that issue. *Masias v. Sec'y, HHS*, 2009 WL 1838979, at *29 (Fed. Cl. Spec. Mstr. June 12, 2009), *aff'd* 634 F.3d 1283 (Fed. Cir. 2011).

[33] A law firm's bottom line is not only affected by income but by expenditures and an evaluation of "need" could involve a close look at salaries, benefits, and highly discretionary expenditure decisions.

[34] I do realize that because of her financial situation, petitioner's application to proceed *in forma pauperis* was granted on June 4, 2010. However, the waiver of a filing fee or court costs required for an indigent person to obtain access to the courts does not thereby compel a court to authorize payment of the expert witness costs necessary to obtain relief. *See, e.g.*, *Victor v. Lawler*, 2011 WL 722387, at *2 (M.D.Pa.); *see also infra* Section III, Part F.3. The statute that authorizes me to waive a filing fee does not similarly authorize me to waive expert costs or to provide funding for expert assistance. 28 U.S.C. § 1915 (1996); *see also Wiley v. United States*, 69 Fed. Cl. 733, 734 (2006) (reiterating the special master's ruling that although he waived the filing fee, allowing the petitioner in that case to proceed *in forma pauperis*, he did not have the authority to appoint an attorney for the petitioner).

E.  The "Incurred" Costs Issue.

Respondent's strongest argument is that the Vaccine Act requires a petitioner to have actually incurred costs before such costs can be paid as part of an interim award. Res. Opp. at 8; *see also* § 15(e)(1).  Respondent defines "incur" to mean become "legally liable to pay."  Res. Opp. at 8 (citing *Black v. Sec'y, HHS*, 33 Fed. Cl. 546, 550 (1995)).  Respondent contends that "petitioner has not incurred any costs for Dr. Harum's services [as an expert], because Dr. Harum has yet to perform those services." Res. Opp. at 8.

1.  Meaning of "Incurred" within the Vaccine Act.

The statute uses the term "incurred," but does not define it.  The common rule of statutory construction is that words are given their plain and ordinary meaning in the absence of any indication otherwise.  *See Cloer*, 133 S.Ct. at 1893 (quoting *BP America Production Co. v. Burton,* 549 U.S. 84, 91 (2006)).  Black's Law Dictionary defines the word "incur" to mean "[t]o suffer or bring on oneself (a liability or expense)."  Black's Law Dictionary 771 (7th ed. 1999).

The Court of Federal Claims has interpreted the word "incur" as it was used in § 11(c)(1)(D)(i), a subsection of the Act that has since been amended to omit the provision containing the word.  *See Black*, 33 Fed. Cl. at 546 (discussing the provision requiring that a petitioner "has incurred in excess of $1,000 in unreimbursable expenses" as a prerequisite for bringing a claim).  The court indicated that  "[o]ne incurs an expense, therefore, at the moment one becomes legally liable, not at the moment one pays off the debt, nor at the moment when one decides that an expense will become necessary one day in the future."  *Id.* at 550.  In quoting another case, the court observed that "'[t]o incur means to become liable for or subject to; it does not mean to actually pay for.'"  *Id.* (quoting *Quarles Petroleum Co. v. United States*, 213 Ct. Cl. 15, 22 (1977)).

In 1996, the Federal Circuit heard a combined appeal that included the petitioner from *Black* and petitioners from two other cases in which the court considered the application of § 11(c)(1)(D)(i).  *See Black v. Sec'y*, HHS, 93 F.3d 781 (Fed. Cir. 1996). In the appeal, petitioners relied on the definition of "incur" found in the Webster's Dictionary, "to become liable or subject to," to argue for reversal of the dismissal of their petitions for failing to have satisfied the $1,000 expense prerequisite.  *Id.* at 785 (quoting *Webster's Third New International Dictionary* 1146 (1968)).  Petitioners argued that given the severity of their injuries they faced the "near-certain prospect of ultimately suffering unreimbursable expenses of more than $1000," and thus "had incurred" $1,000 in expenses at the time of their injury.  *Black*, 93 F.3d at 785.

The Federal Circuit rejected petitioners' interpretation of "incurred" and held that incurred costs meant "expenses for which payment has been made or for which liability has attached."  *Id.* at 786.  The Court noted that § 15(a)(1)(A) distinguished between

unreimbursable expenses incurred at a certain time and those "reasonable projected unreimbursable expenses that have been or will be incurred," and that adoption of petitioners' definition would therefore result in superfluous language in § 15 because there would be no difference between the projected expenses that "have been" or "will be" incurred. *Id.*

### 2. Application of Definition to Dr. Harum's Retainer.

It does not appear from the documents submitted[35] that petitioner is currently obligated or legally liable to pay Dr. Harum. Conversely, Dr. Harum is not legally obligated to begin performance (review of B.A.B.'s case and preparation of an expert report to be filed with the court) until the retainer is paid.

Doctor Harum has offered to serve as an expert in this case, but has made payment of the $600 retainer a condition precedent[36] for her to begin reviewing the medical records. As Dr. Harum indicated in her letter, she can "have a document prepared within 90 days from the date that *I am retained*. A retainer fee of $600 will be accepted . . . ." Pet. Ex. 22 at 8 (emphasis added). Until petitioner pays the retainer, Dr. Harum is not obligated to begin performance.

Because petitioner has neither made a payment to Dr. Harum nor become legally liable for a payment at this time, petitioner cannot be considered to have incurred a cost.

## F. Is a Request for Advance Funding Distinguishable from Interim Awards of Fees and Costs?

Assuming, *arguendo*, that petitioner has met all the requirements for payment of interim costs, there are three factors that could militate against advancing payment in this case. First, the legislative history for § 15 of the Act suggests that the provision for payment of fees and costs in unsuccessful cases was included in order to ensure that those seeking compensation for a vaccine injury would have ready access to a competent attorney to represent them, not to ensure that funding would be available to obtain experts. Second, the contemporaneous records and the early reports by petitioner and her husband to health care providers about the onset of B.A.B.'s symptoms differ markedly from the claims now made regarding vaccine causation. Comments by petitioner and B.A.B.'s father suggest that part of the reason for filing and

---

[35] Only the January 22, 2012 letter Dr. Harum wrote regarding her willingness to serve as an expert has been filed. *See* Pet. Ex. 22. A copy of any formal retainer agreement between Ms. Fester and Dr. Harum has not been provided to the court.

[36] As the Court of Federal Claims has noted, "[a] condition precedent is either an act of a party that must be performed or a certain event that must happen before a contractual right accrues or contractual duty arises." *Haddon Housing Assoc., LLC v. U.S.,* 99 Fed. Cl. 311, 326 (2001) (quoting R. Lord, 13 *Williston on Contracts* § 38:7 (4th ed. 2000)).

pursuing this claim was to obtain a definitive diagnosis and the probable etiology of B.A.B.'s disorder. Payment of fees and costs in advance could encourage the filing of cases in order to obtain expert evaluations that might not otherwise be affordable. Finally, court involvement in the "pre-selection and payment" of experts could greatly burden the Vaccine Program and complicate a process meant to be a quick and less complex means to compensate those injured by vaccination. *See* H.R. REP. NO. 99-908, at 3 *reprinted in* 1986 U.S.C.C.A.N. 6344, 6344.

    1. Legislative History - Encouraging Involvement by Competent Counsel.

     By paying attorneys' fees to unsuccessful litigants, the Act encourages counsel to represent petitioners in Vaccine Act cases and, in particular, the off-Table injury claims where petitioners must perform the "heavy lifting" to demonstrate that a vaccine is more likely than not responsible for their injuries. H.R. REP. NO. 99-908, at 22 *reprinted in* 1986 U.S.C.C.A.N. 6344, 6363; *see also Hodges v. Sec'y, HHS*, 9 F.3d 958, 961 (Fed. Cir. 1993) (referring to the heavy burden placed on petitioners presenting causation in fact claims). An attorney representing petitioners in Vaccine Act cases performs many roles and, sometimes, after a careful examination of the evidence and the law, the most important of those is providing a candid assessment of the merits of a case to a petitioner whose firm, fixed belief in vaccine causation is unsupported by evidence. In these cases, fees are almost invariably awarded in order to effectuate the policy behind the fees provisions of the Act.

    It is clear from the legislative history of the Vaccine Act that Congress wanted to provide an incentive to attorneys to represent Vaccine Act petitioners. H.R. REP. NO. 99-908, at 22 *reprinted in* 1986 U.S.C.C.A.N. 6344, 6363; *see also Cloer*, 133 S.Ct. at 1895; *Saunders*, 25 F.3d at 1035. Interim fees help effectuate this purpose. However, it is by no means clear that Congress intended to advance funds from the Vaccine Trust Fund to allow petitioners to establish a prima facie case. To the contrary, the statutory scheme requires that petitioners present a comprehensive case for entitlement to compensation at the time the petition is filed.[37] *See* § 11(c) (specifying the contents of a petition filed under the Program). Advance payment of costs could encourage the filing of "bare bones" petitions, with the expectation that the court will approve advance payment for obtaining the statutorily-required records and opinions necessary to demonstrate causation, only to be followed by the dismissal of a jurisdictionally defective or meritless petition.

---

[37] I recognize that this provision is more honored in the breach than in the practice. It is not uncommon for petitioners to file a "bare bones" petition, unaccompanied by medical records or medical opinions as to causation, although that practice is now discouraged by special masters. The autism and hepatitis B omnibus proceedings have demonstrated the importance of locating and filing all relevant medical records at the earliest possible point in the proceedings. Past practice does not, however, negate the clear expressed intent of the legislature that petitioners file the evidence showing vaccine causation at the time of filing the petition itself. In most cases filed in the last four to five years, at least some medical records are filed either with the petition or as soon as the case is converted to electronic filing.

In this case, petitioner has yet to find an attorney who meets her requirements. She claims that the lack of an expert opinion is one of the reasons no attorney has yet been willing to take her case. However, the evidence filed to date suggests another reason: the filed evidence simply does not support petitioner's claim that B.A.B. experienced fever, a rash, uncontrollable crying, and loss of language, constituting an "encephalopathy" after his MMRV vaccination at one year of age. Although the records reflect several high fevers and rashes at periods of time both before and after the April, 2007 vaccinations as well as numerous calls and visits to the pediatrician for other more minor concerns,[38] they do not reflect any visits or telephone calls reporting such concerns after the April 2007 vaccinations.

     2.  Motivation in Seeking Expert Review.

I have discussed the conflicts between the petition and B.A.B.'s records regarding onset and cause of his condition, whether it is characterized as an ASD or an encephalopathy, with petitioner at several status conferences. In her response to respondent's motion to dismiss, petitioner argued about what various physicians have said regarding vaccine causation, but failed to identify anywhere in the medical records filed that such statements appear.

It is true that an expert could base a causation opinion on something other than the medical records filed. Such opinions are unlikely to be persuasive to a special master unless there are reasons to reject the contemporaneous records (or lack of such records when the severity of symptoms would suggest that caring and concerned patients would seek treatment). *See Burns v. Sec'y, HHS*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that "the special master did not err in accepting the contemporaneous medical records over the testimony of fact witnesses"). Our caselaw suggests that contemporaneous records are strongly favored over affidavits or testimony elicited years later. *See, e.g., Cucuras v. Sec'y, HHS*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). B.A.B.'s parents were not shy about contacting the afterhours number when he was ill, and during the illness in which B.A.B.'s fever was reported as 107°, they induced their pediatrician to meet B.A.B. and his father at the pediatrician's office in the late evening of New Year's Day or in the early morning hours of the day following.

Reading between the lines, it appears that petitioner's financial difficulties have interfered with her ability to have B.A.B. continue treatment with Dr. Harum, and what she and B.A.B.'s father really seek is a firm diagnosis and an identified cause for B.A.B.'s condition. This would be a matter of high priority for nearly any parent, and the record establishes that both of B.A.B.'s parents are caring and concerned and seek only the best for their child. A lawsuit, however, is not a vehicle for seeking medical care or such answers. Unsophisticated in the law as they are, their statements indicating their

---

[38] *See, e.g.*, Pet. Exs. 4, pp. 4, 13-15; 6, pp. 6-7.

expectation that the court would appoint an expert or that it should provide them with the funds necessary to evaluate B.A.B.'s condition strongly suggest that they did not understand their legal obligation to present a case for entitlement at the time B.A.B.'s case was filed. *See* Status Conference held July 28, 2011 (asking for an expert evaluation of B.A.B.); Status Conference held Dec. 9, 2011 (requesting an order be issued or letter provided to Dr. Harum telling her she will be paid at the end of the case).

    3.  Practical and Policy Concerns.

If funds are advanced, there is no way of ensuring that the funds are used for their intended purpose.[39]  When reimbursement is sought for funds already expended, there is a motivation to exercise judgment in selecting the expert and in monitoring that expert's work and expenditures.  When a petitioner (or his or her attorney) expends funds or time on the case to secure an expert opinion, someone other than the court is monitoring the hourly rate paid and the hours authorized.  *See Perreira*, 1992 WL 164436, at *4, *aff'd*, 27 Fed. Cl. 29 (1992), *aff'd*, 33 F.3d 1375 (Fed. Cir. 1994) (referring to counsel's obligation to monitor expert costs).

In contrast, when advance payment is sought, the court must, of necessity, insert itself in such matters.  What happens when the court determines that the hourly rate requested is too high, that the hours proposed are excessive, or that the expert is not sufficiently qualified to opine?  Petitioners may be denied thereby the only expert who is willing to favorably opine on their case.  Of course, when final or interim costs are requested, the court may well come to similar conclusions, but it does so at a time when the expert's bill is before the court, his or her qualifications have been presented and challenged (either in a hearing or a motion) and, most importantly, the expert's work product is available for review.

Advance payment of costs would open the door to advance payment of fees.  It would not be unreasonable to expect that an attorney, experiencing cash flow problems, might request an advance payment for work he or she expects to do on a case to prepare it for a hearing, to answer a motion to dismiss, or simply to collect and file the medical records expected to accompany the petition itself.  If financial hardship is a consideration in advancing costs for this *pro se* petitioner, then should not the court consider the financial hardship for an attorney representing a petitioner?

In other contexts, courts do authorize payment for expert witnesses.  In criminal cases, there is a due process right, grounded in the Fourteenth Amendment, for an

---

[39] While the government might institute proceedings to recoup payment, an impecunious defendant is effectively judgment-proof.  I do not imply that I think this petitioner is likely to misuse funds provided to her for purposes of securing an opinion on vaccine causation, but a determination that advance payment of costs is available would impact on more cases than B.A.B.'s claim alone.

indigent defendant to obtain expert assistance at trial[40] or materials necessary to prepare an appeal.[41]  However, the state must provide only the assistance needed to satisfy due process.  *See Ross v. Moffitt* , 417 U.S. 600, 601 (1974) (determining that an indigent defendant must be given "an adequate opportunity to present his claims fairly in the context of the State's appellate process," but need not be given the same resources available to a wealthier defendant); *United States ex rel. Smith v. Baldi*, 344 U.S. 561, 570 (1953) (finding that although the defense was not provided with an expert witness, due process was not violated because a neutral psychiatrist had examined the defendant).   A specific level of remedy is not dictated, but a variety of approaches may be used to satisfy a defendant's due process right.  *Griffin*, 351 U.S. at 20 (indicating a variety of methods to provide defendants with a report of trial proceedings could be employed).  For example, in a case before the Third Circuit, the Department of Justice was not required to reimburse a defendant for all expert costs, only those costs associated with determining his competency to stand trial as required under 18 U.S.C. § 4244 (1976).  *United States  v. Rogalsky*, 575 F.2d 457, 461 (3d Cir. 1978).  The expert costs stemming from examinations used to establish his defense of insanity were deemed more appropriately paid from the public defender's budget.  *Id.*; *see also* 18 U.S.C. § 3006A(e) (1976).

The Supreme Court has also applied a Fourteenth Amendment due process right in the context of the "quasi-criminal" proceedings of a paternity suit.  The Supreme Court held that to determine paternity, Connecticut should have provided blood tests without cost to an indigent putative father.  *Little v. Streater*, 452 U.S. 1, 10 (1981).  The Supreme Court reasoned that the putative father's future costs for child support would be a taking of property under the Fourteenth Amendment.   *Little*, 452 U.S. at 6.  However, the right has not been extended to civil litigation to recoup damages, even when the damages sought were for an alleged due process violation. *See Boring v. Kozakiewicz*, 833 F.2d 468 (3d Cir. 1987) (finding no right to public funding of an expert witness for former pretrial detainees suing the county for medical malpractice while incarcerated); *see also Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437 (1987) (prevailing party in a civil rights suit may not claim expert witness fees as costs).

I note that in *Avera* when the Federal Circuit ruled that interim fees were available in Vaccine Act cases, the Court looked to other fee-shifting statutes in which interim fees had been authorized in spite of the statutes' silence.  *Avera*, 515 F.3d at 1351-52.  The Circuit examined cases involving the Emergency School Aid Act, the Civil Rights Attorney's Fees Awards Act of 1976, the Freedom of Information Act, and Title

---

[40] *Ake v. Oklahoma,* 470 U.S. 68, 86-87 (1985) (explaining that "mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process").

[41] *Griffin v. Illinois,* 351 U.S. 12, 17 (1956) (holding that "due process and equal protection both call for procedures in criminal trials which allow no invidious discriminations between persons and different groups of persons").

VII of the Civil Rights Act of 1964. Although all statutes were found to allow for interim awards, I could find no case in which litigation costs were advanced. Similarly, when expanding my research to statutes such as the Black Lung Benefits Act, I could find no instance of advance payment of attorney fees or costs.[42]

## IV. Conclusion.

Approximately a quarter century ago, Congress authorized an experiment in tort reform. It created a no-fault compensation scheme in which petitioners had only to prove vaccine causation of their injury in order to obtain generous compensation.[43] In some cases, based on the vaccine, the timing, and the nature of the injury, compensation was presumed. To ensure that vaccine-injured claimants had ready access to attorneys willing to take their cases, Congress did something unprecedented. It authorized attorneys' fees and costs even when petitioners do not prevail. Congress also mandated that petitioners present a documented and supported case for vaccine causation at the time the claim was filed. Read *in pari materia*, these statutory provisions do not support granting the relief petitioner seeks.

**Petitioner's request for advance funding of interim expert costs is DENIED. Petitioner shall file <u>by no later than Thursday, September 26, 2013</u>, a status report informing the court how petitioner intends to proceed.**

The clerk of the court shall forward a copy of this Decision to petitioner by certified mail, return receipt requested and a second copy by regular mail.

**IT IS SO ORDERED.**

**Denise K. Vowell**
Special Master

---

[42] Although this is the first case in which I decide the issue of advancement of costs to an indigent *pro se* litigant, the issue of advance payment of litigation costs has been raised in at least two recent rulings, *Klein* and *Mostovoy*. *See Klein v. Sec'y, HHS,* No. 12-560V (soon to be posted on the Court's website) (denying petitioners' request for $500, the fee required to obtain autopsy slides); *Mostovoy v. Sec'y, HHS*, No. 02-10V, 2013 WL 3368236, at *27 (denying petitioners' request for advance funding of expert costs and research). From informal discussions with my colleagues, I also am aware of two other cases with pending requests for advance funding of expert fees and testing.

[43] Although there are statutory "caps": on pain and suffering, § 15(a)(4), and on lost wage claims for those who were minors at the time of injury, § 15(a)(3)(B), the statute authorizes full payment for actual or projected unreimbursable expenses, § 15(a)(1). Moreover, in civil tort suits filed on a contingent fee basis, an attorney may take between 25%-50% of the damages awarded as attorney fees, effectively wiping out the higher pain and suffering awards received in civil litigation.